# Krelic v. Mutual Pharmaceuticals Company, Inc.

*Daniel W. Ernsberger*, for plaintiffs.
*Constantine J. Passodelis*, for defendant.

WETTICK, *J.*, May 1, 2013—Defendant's motion for summary judgment seeking dismissal of plaintiff's first amended complaint is the subject of this opinion and order of court.

Plaintiffs have instituted state tort failure-to-warn claims against a generic drug manufacturer. This manufacturer uses the warning label used by the manufacturer of the brand-name drug. For purposes of defendant's motion for summary judgment, i will assume that under state tort law the warnings are inadequate.

I.

Defendant seeks dismissal of the failure-to-warn claims on the ground that these failure-to-warn claims are preempted by federal law. Defendant bases its preemption defense on a June 23, 2011 ruling by the United States Supreme Court in *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011).

In *PLIVA*, the generic manufactures raised the following preemption defense: federal law requires a generic manufacturer to use the label of the brand-name manufacturer. Plaintiffs; state law claim is based on the failure of the generic manufacturer change its label to include a warning about the risks of developing CSR. A potential side effect. This requirement, imposed by state tort law, that the generic manufacturer change its label, requires the manufacturer to do what it is prohibited from doing under federal law, namely to use safety and efficacy labeling that differs from that used by the brand-name manufacturer. Where it is impossible for the generic manufacturer to comply with state tort law duties without violating a federal law, settled law establishes that state law must give way.

The United States Supreme Court, in a 5-4 split, found merit to the above argument of the generic manufacturer's strengthening its warning label would violate federal statutes and regulations requiring a generic manufacturer's drug label to match the label of the brand-name manufacturer.

The court's opinion began with what was not in dispute. A manufacturer seeking federal approval to market a new drug must prove that the new drug is safe and effective

and that the proposed label is accurate and adequate. However, a generic drug can gain FDA approval simply by showing equivalence to a listed drug that has already been approved by the FDA and by showing the safety and efficacy labeling which this generic manufacturer proposes is the same as the labeling approved for the brand-name drug:

> A generic drug application must also "show that the [safety and efficacy] labeling proposed ... is the same as the labeling approved for the [brand-name] drug." [21 U.S.C.] § 3559j0(2)(A)(v); *see also* § 355(j)(4)(G); Beers §§ 30.01, 3.03[A].

*PLIVA*, 131 S. Ct. at 2574.

The court stated that what is in dispute is whether, and to what extent, generic manufactures may change their labels after initial FDA approval of the generic drug.

Prior to *PLIVA, in Wyeth v. Levine*, 555 U.S. 555 (2009), the United States Supreme Court had addressed the issue of whether a state law failure-to-warn tort claim may be brought against a brand-name manufacturer for failure to have modified the warning label placed on the drug once it had been approved by the FDA.

The brand-name manufacturer made the same preemption argument that was made in *PLIVA*: under federal law, the manufacturer must use the warning labels approved by the FDA. Thus, the manufacturer would violate federal law if, without FDA approval, it included stronger warnings in order to comply with state tort law. *Id.* at 563.

The court ruled against the brand-name manufacturer. If found that it was not impossible for Wyeth to comply with state and federal law obligations because of an FDA regulation which permits a brand-name manufacturer to make certain changes to its label before receiving FDA approval. The court stated:

> Among other things, this "changes being effected" (CBE) regulation provides that if a manufacturer is changing a label to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," it may make the labeling change upon filing its supplemental application with the FDA; it need not wait for FDA approval. §§ 314.70(c)(6)(iii) (A), (C).

*Id.* at 568.

In *PLIVA*, the court reached the opposite result. It did so because the legislation and regulations, as interpreted by the FDA, allow changes to generic labels only when a generic drug manufacturer changes its labels to match an updated brand-name label or to follow the FDA's instructions. Under FDA interpretations, changes unilaterally made to strengthen a generic drug's warning label would violate federal legislation and regulations requiring and generic drug's label to match its brand-name counterparts. 131 S. Ct. at 2575.

Defendant contends that the question of whether state failure-to-warn tort claims may be brought against a

generic manufacturer using the same safety and efficacy labeling used by the brand-name manufacturer has been resolved through the *PLIVA* opinion, which holds that state tort claims may not be brought because of the FDA requirement that the labeling be the same. Thus I should dismiss plaintiffs' failure-to-warn tort claims.

Plaintiffs raise the following argument in support of their position that *PLIVA* does not bar a generic manufacturer, which is a different entity than the brand-name manufacturer, from including risks that are not disclosed in the brand-name label: *PLIVA* considered only the provision within 21 U.S.C. § 355(j)(2)(A)(v) (quoted at page 2 of this opinion) requiring the generic manufacturer to use the labels of the brand-name manufacturer. [Plaintiffs are correct.] However, this legislation includes the Different Manufactures Exception. [Plaintiffs are correct.]

This Exception reads as follows:

An abbreviated application for a new drug shall contain…information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) *except for changes required* because of differences approved under a petition filed under subparagraph (C) or *because the new drug and the listed drug are produced or distributed by different manufacturers.*

21 U.S.C. § 355(j)(2)(A)(v) (emphasis added).

In *PLIVA*, neither the opinion of the court nor the dissenting opinion mentioned the Different Manufacturers

Exception. [Plaintiffs are correct.]

This means, according to plaintiffs, that the Different Manufacturers Exception permits a generic manufacturer to comply with sate tort law governing a failure to warm by strengthening its safety and efficacy labeling.

It is this final step where plaintiffs encounter a problem. Plaintiffs do not explain why the scope of the Different Manufacturers Exception would allow generic manufacturers to deviate from the labeling of brand-name drugs by adding contraindications, warnings, precautions, adverse reactions, and other information related to the active ingredients of both the brand-name and generic manufacturers.

The Different Manufacturers Exception refers to changes "required" because the manufacturers are different. The use of the word "required" refers to changes to the label of the generic manufacturer that are triggered by the manufacturer of the generic drug not being the same as the manufacturer of the brand-name drug. The active ingredients of a generic and a brand-name drug are identical, so changes are not "required" with respect to warnings and other safety-related information concerning the active ingredients.

Most drugs on the market are generic.[1] Thus, under plaintiffs' construction of the Different Manufacturers Exception, the scheme under which generic drugs shall use

---

1. The dissenting opinion in *PLIVA*, 131 S. Ct. at 2584, cites a study which states that seventy-five percent of all prescribed drugs are generic drugs, and that ninety percent of prescriptions for which a generic version is available are now filled with the generic drug.

the FDA-approved label of the brand-name manufacturer would be rendered almost meaningless. Plaintiffs cannot explain why this is what Congress intended.

In *PLIVA*, the opinion of the court looked to the FDA's interpretations of the legislation and regulations in deciding whether the generic labels regarding safety and efficacy could be strengthened. It cited case law holding that the FDA's interpretations are controlling unless plainly erroneous or inconsistent with the regulations or where there is another reason to doubt that these views reflect the FDA's fair and considerate judgments. 131 S. Ct. at 2575.

At 21 C.F.R. § 314.94(a)(8)(iv), the FDA has described the scope of the Different Manufacturers Exception. The scope, as described below, does not include any differences relating to active ingredients:

> Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product must be the same as the labeling approved for the reference listed drug, except for changes required because of differences approved under a petition filed under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers. *Such differences between the [generic] applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling, revisions made to comply with current FDA labeling guidelines or other guidance, or omission of*

*an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(i)(5) (f) of the act.*

21 C.F.R. § 314.94(a)(8)(iv) (emphasis added).

A February 8, 2012 letter from Dr. Jane Woodcock, Director of FDA's Center for Drug Evaluation and Research, Docket No. FDA-2011-P-0702, addressed the petition of a manufacturer of a brand-name drug requesting that the FDA refrain from approving generic manufacturer applications unless they use the same labels. The letter denying the manufacturer's request that the FDA bar a generic manufacturer from issuing new instructions for splitting the label discussed the scope of the Different Manufactures Exception. AT pages 3 and 4 of the letter, Dr. Woodcock states:

Similarly, the regulations at 21 CFT 314.94(a)(8)(iv) require the following:

Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the [generic] drug product must be the same as the labeling approved for the reference listed drug, except for changes required because of differences approved under a petition filed under § 314.93 [21 CFT 314.93] or because the drug product and the reference listed drug are produced or distributed by different manufacturers.

Section 314.94(a)(8)(iv) sets forth examples of permissible differences in labeling that may result because the generic drug product and reference listed drug are produced or distributed by different

manufacturers. These difference include the following:

> ...differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA. Labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(4)(D) of the [A]ct.[2]

We have interpreted the difference-due-to-differences-in-manufacturer exception to apply when the ANDA differs in an aspect that is not required by the statute or regulation to be the same as the RLD (e.g. a difference in inactive ingredients).[3]

At page 9 of her Report, Dr. Woodcock states:

> We believe that labeling differences of the type you suggest would be acceptable under the relevant statute and regulations as a permissible difference due to difference in manufacturer. As mentioned above,

---

2. WE note that, due to a series of amendments to the FD&C Act, the reference in § 314.94(a)(8)(iv) to section 505(j)(4)(D) of the FD&C Act corresponds to current section 505(j)(5)(F) of the FD&C Act.

3. *See* generally, *Zeneca Inc. v. Shalala,* 213 F. 3d 161, 169 (4th Cir. 2000). In Seneca the Fourth Circuit agreed with FDA's interpretation of section 314.94(a)(8)(iv) allowing the generic drug product label for propofol with the preservative sodium metabisulfite to differ from the RLD by containing a warning against possible allergic reaction to the preservative. Specifically, the court concluded that "[b]ecause a difference in preservative is a permitted variation in formulation, it is reasonable for the FDA to interpret its own regulation to allow corresponding difference in labeling to identify the preservative and provide any appropriate warnings." *Id. See also* September 15, 2009, letter from Janet Woodcock, Director, Center for Drug Byaluation and Research, to Beth Brannon at al, Docket Nos. FDA-2005-P-003, FDA-2006-P-0019, FDA-2006-P-0331, and FDA-2006-P-0391 (FDA permitted the generic product to contain a previously approved formulation of the drug product and carry labeling different from the reformulated RLD product).

generic products are permitted to have labeling that differs from the labeling of the FLD, FDA regulations in § 314.94(a)(8)(iv) require that the "labeling…proposed for the [generic]drug product must be the same as the labeling approved for the reference listed drug, except for changes required because of differences approved under a petition filed under § 314.93 *or because the drug product and the reference listed drug are produced or distributed by different manufacturers*" (emphasis added). FDA has interpreted this exception to apply when an aspect of the ANDA product that is not required by statute or regulation to be the same as that of the RLD (such as an inactive ingredient) is different, and the difference necessitates a difference in labeling. Here, because the labeling difference for an ANDA would relate to an aspect of the product that is not required by statute or regulation to be the same as that of the RLD *i.e., the scoring pattern), the difference in labeling for a generic single-scored 150 mg doxycycline hyclate would fall within the difference-due-to-different-manufacturers exception set out at 21 CFT 314.94(a)(8)(iv).

The Doryx 150 mg product is currently marketed as a dual-scored product (with the single-scored product still on the market until the inventory is returned to the RLD manufacturer or is depleted). For an ANDA applicant that seeks approval of a single-scored product (identical to the RLD prior to its change to the dual-scored product) and seeks to omit the information regarding the dual score, FDA may permit such a difference. The new instructions for splitting the tablet added by the

RLD to not have a bearing on the single-scored generic product because these instructions pertain only to the dual-scored configuration and the generic product is not dual-scored. It is therefore possible to simply omit these instructions from labeling for a generic single-scored product without adverse consequence. Thus, in this instance, FDA may allow a 150 mg doxycycline hyclate delayed-release product to have labeling different from Doryx to account for differences in scoring configuration because the product is produced by a different manufacturer. Any ANDA manufacturer who receives approval for a single-scored tablet will be expected to change to a dual-scored tablet upon the manufacture of its next production batch. We make this type of decision on a case-by-case basis in accordance with relevant statutes and FDA regulations.

Where the brand-name manufacturer and the generic manufacturer are the same, the labels will be the same because the products will be the same. Where (as is almost always the case) the manufacturers are not the same, the inactive ingredients of the generic manufacturer's drug need not be the same as the inactive ingredients of the drug of the brand-name manufacturer. Thus, the labeling as t the inactive ingredients need not be the same. In her February 8, 2012, letter, Dr. Woodcock described changes that the permitted:

> ...differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other

aspect of labeling protected by patent or accorded exclusivity under section 505(j)(4)(d) of the [A]ct, (Footnote omitted).

In summary, Dr. Woodcock states that the Different Manufacturers Exception permits labeling differences that relate to differences between the generic drug and the brand-name drug. However, the active ingredients of the generic drug and the brand-name drug must be the same. Thus, the warnings as to the side effects and safety of the active ingredients must be the same.

In its brief filed in the United States Supreme Court, PLIVA discussed the Different Manufacturers Exception. i find its argument, set forth below, to be convincing:

> Of course, certain labeling differences are unavoidable. Petitioners' generic versions of Wyeth's Reglan® cannot, for instance falsely represent that they too are manufactured by Wyeth. *See* 21 U.S.C. § 331(b); *id.* § 321(n). Hatch-Waxman therefore authorizes labeling variances where "'the [genetic] drug and the [brand-name] drug are produced or distributed by different manufacturers.'" 21 U.S.C. § 355(j)(2)(A)(v). FDA has interpreted this language to permit differences

> In expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity.

21 C.F.R. § 314.94(a)(8)(iv). The regulation pointedly

does not authorize divergent product warnings.

That is no accident, *FDA received dozens of comments when it proposed regulation. including two submissions proposing that it "be revised to permit ANDA applicants to deviate from the labeling for the [branded] drug to add contraindications, warnings, precautions. Adverse reactions and other safety-related information.* 57 Fed. Reg. At 17961, Pet. App. 108a (emphasis added). *FDA rejected the proposal*:

FDA disagrees with the comments. Except for labeling differences under section 505(j)(2)(v) of the act, *the ANDA product's labeling must be the same as the listed drug product's labeling because the listed drug product is the basis for ANDA approval.* Consistent labeling will assure physicians, health professionals, and consumers that a generic drug is as safe and effective as its brand-name counterpart.

*Id.*, Pet. App. 109a (emphasis added; citing 21 U.S.C. § 355(j)(2)(A)(v); *see also id.* at 17953, Pet. App. 104a ("As for accepting ANDA's with additional warnings or precautions...the act requires that the applicant's proposed labeling be the same as that of the [branded] drug.") (citing 21 U.S.C. 5 § 355(j)(2)(A)(v) (j)(3)(G).

While PLIVAs' brief addressed the Different Manufacturers Exception, neither plaintiffs' brief nor any of the twelve *amicus* briefs filed in *PLIVA* in support of the plaintiffs, including FDA's brief, mentioned the exception. Furthermore, the dissenting opinion viewed the majority opinion as reaching all generic drugs: "Today's decision

affects 75 percent of all prescription drugs dispensed in this country." 131 S. Ct. at 2583.

The only explanation for the failure of the briefs supporting plaintiffs or the Supreme Court's opinions in *PLIVA* to discuss the Different Manufacturers Exception is that the exception does not permit different labeling as to safety and efficacy.

## II.

Plaintiffs also have pled other causes of action which, according to plaintiffs, are not dependent in any way on a failure to warn. Defendant has raised the statute of limitations.

Since discovery is not complete, I cannot address these matters at this time.

For these reasons, I enter the following order of court:

## ORDER OF COURT

On this 11th day of April, 2013, it is ordered that:

(1) all claims raised in plaintiffs first amended complaint that require a showing of a failure to warn are dismissed;

(2) within twenty (20) days, plaintiffs shall file a preliminary pretrial statement describing the claims, other than those dismissed in paragraph (1) of this order, which they seek to pursue; and

(3) a status conference will be held on May 10, 2013 at 10:00 A.M. o'clock.